[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11317

_____

JASMINE ADAMS,
Individually and as Natural Parent of
McKenzie Adams, Deceased,
JANICE ADAMS,
As the Personal Representative of the
Estate of McKenzie Adams,

Plaintiffs-Appellants,

*versus*

DEMOPOLIS CITY SCHOOLS,
KYLE KALLHOFF,
TORI INFINGER,
GLORIA MIMS,
TRACY STEWART,

Defendants-Appellees,

U.S. JONES ELEMENTARY SCHOOL,

Defendant.

———————————

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 2:20-cv-00027-TFM-N

———————————

Before JILL PRYOR, GRANT, and HULL, Circuit Judges.

JILL PRYOR, Circuit Judge:

"N*****,"[1] "black bitch," "dumb black bitch," "pussy ass bitch," "go kill yourself." These are the words that nine-year-old McKenzie Adams heard from her fourth-grade classmate before she took her life in December of 2018. After McKenzie's death, her mother, Jasmine Adams, and her grandmother, Janice Adams, sought to hold McKenzie's school system and several school officials accountable for her death. The Adamses filed a lawsuit asserting claims arising under federal and state law against the school

---

[1] We have sanitized one of the racial epithets repeatedly directed at McKenzie Adams by replacing the full slur used with "n*****." In doing so, we do not mean to diminish its impact.

system and the school officials. The district court granted summary judgment to the school system and its officials, concluding that the Adamses failed to satisfy various elements of their federal statutory claims and that qualified immunity barred at least one of the claims. As to the Alabama tort claims, the court concluded that the school system and its officials were entitled to immunity under state law. And even if they were not entitled to immunity, the court continued, the school system and officials did not proximately cause McKenzie's injury because her suicide was an unforeseeable act that cut off any proximate causation.

The Adamses appeal the district court's grant of summary judgment on all their claims. After careful consideration of the record, and with the benefit of oral argument, we affirm. Although the response of the school system and its officials was truly discouraging, the standard for relief in cases of student-on-student harassment is exacting. Thus, despite the tragic facts of this case, we affirm the district court's decision granting summary judgment to the school system and its officials.

## I.          BACKGROUND

In this section, we begin by describing the bullying that McKenzie faced in the months leading up to her death. We then discuss the policies the school system had in place to address bullying and suicide prevention. Lastly, we recount the litigation that followed McKenzie's death.

## A.    The Bullying

McKenzie Adams, a nine-year-old Black girl, attended U.S. Jones Elementary School in Demopolis, Alabama.[2] The school was a part of Demopolis City Schools school district ("DCS"). In August 2018, McKenzie began attending the elementary school as a fourth-grade student. She lived with her grandmother, Janice Adams, in Demopolis but kept in close contact with her mother, Jasmine Adams, who lived in Tuscaloosa.

Almost immediately after the start of the school year, McKenzie was bullied. One of the students who was bullying McKenzie was E.C.[3] E.C. was a White male student, similar in age to McKenzie. Beginning in August, McKenzie told her grandmother that E.C. was bothering her at school. McKenzie reported that E.C. called her names almost every day. The comments he made to McKenzie included: "black bitch, dumb black bitch, you n*****, go kill yourself, [and] [p]ussy." Doc. 189-11 at 49.[4] Another student, C.J., heard E.C. call McKenzie "n*****" multiple times. Doc. 189-13 at 25–26. A different student recalled hearing E.C. tell McKenzie that she was "too dark," a reference to her skin complexion. Doc. 189-15 at 24.

---

[2] Given our standard of review at the summary judgment stage, in recounting the facts of this case, we accept the Adamses' version of disputed facts and draw all reasonable inferences from those facts in their favor. *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002).

[3] We identify the students, who are minors, by the initials used by the parties.

[4] "Doc." numbers refer to the district court's docket entries.

Other students also bullied McKenzie. C.J. recalled that, at least once, two other male students (D.M. and C.T.) pulled McKenzie's hair, hit her, and slapped her in the back. C.J. also described an instance where McKenzie mistakenly stepped on the back of another student's shoe. That student (C.T.) called McKenzie "black motherfucker" in return. Doc. 189-13 at 24–25. Several students (E.C., D.M., and C.T.) criticized McKenzie's hair.

Once when C.J. heard E.C. call McKenzie "n*****," he told Gloria Mims, one of McKenzie's teachers. Another time, when Mims heard E.C. call McKenzie "n*****," she disciplined E.C. by sending him to the office and memorializing the incident in writing—"[s]he wrote him up." *Id.* at 26. E.C. received several days of in-school suspension for the incident.

On yet another occasion, C.J. and another student reported the bullying to Mims and Whitney Mosley, McKenzie's homeroom teacher. When the teachers tried to confirm the bullying instances with McKenzie, she denied that there was any bullying and said that the other students were just playing with her.

But this harsh treatment from her classmates plainly upset McKenzie. She would cry or sit at her desk and lay her head down. After McKenzie told her grandmother about the bullying, Janice advised her to report it to Mims. McKenzie responded that she had already done so. She told Janice that Mims would either send E.C. into the hallway (as a form of discipline) or tell McKenzie to go sit down.

In late August, Janice called the school to speak with Mims about the bullying. Mims never called her back. Around the same time McKenzie received her school progress report, which detailed her current achievement levels in each classroom subject. Janice and McKenzie's mother were surprised to see that she had received a D letter grade in math. The D was unusual because McKenzie normally earned As and Bs on her classwork. Janice wrote a note on the progress report, "Need conference with Ms. Mims, not happy about math grade at all." Doc. 189-11 at 63. Janice listed her phone number on the note so that Mims could call her. Janice gave the progress report with the note to McKenzie so that she could return it to her teacher.

By September, nobody from the school had called or otherwise reached out to Janice. Janice then went to the school to speak directly to Mims. Janice and Mims spoke about McKenzie's grades. Janice told Mims that E.C. was bullying McKenzie and that she believed McKenzie received a D on her progress report because of the bullying. Mims responded that McKenzie was talking a lot in class. Janice mentioned that the misbehavior was probably because of the bullying. Janice stated that she would resolve the talking issue with McKenzie, but Mims needed to address E.C.'s bullying.

The bullying continued. In October, while Janice was at the school to participate in a school event, she attempted to speak with Mims about McKenzie and E.C. But Mims was surrounded by other parents who were also trying to speak with her. Because Janice could not wait, she told Mims that she could not stay but was

leaving her name and number because she needed to speak with Mims about McKenzie and E.C. Mims did not reach out to Janice, however.

A few weeks later, in late October or early November, Assistant Principal Tracy Stewart called Janice to discuss an incident in which McKenzie was written up for misbehavior. Stewart told Janice that McKenzie and another student were passing a note back and forth in class. Although Stewart would not tell Janice the identity of the other student involved, McKenzie later told Janice that the other student was E.C. The note read:

> E.C.: hey little pussy sucker what up
> McKenzie: I hate you
> E.C.: But you like asshole dumb ass bitch
> E.C.: pussy=McKenzie
> McKenzie: You are u-g-l-y bitch
> E.C.: Your uglier than big birtha u bitch pussy bitch suck it fuck you
> McKenzie: . . . [three dots were drawn]
> E.C.: What the hell do you mean
> McKenzie: Sorry can't talk
> E.C.: fuck you[.]

Doc. 181-17 at 2.

After learning that E.C. was the other student involved in the note-passing, Janice told Stewart that E.C. had been bullying McKenzie since the school year started. Stewart explained she nonetheless had to discipline McKenzie because McKenzie had written profanity, "bitch," on the note. Janice agreed that McKenzie

should be disciplined, but she said Stewart "need[ed] to do something about [E.C.] bullying [McKenzie]." Doc. 189-11 at 85.

Initially, Stewart responded that she did not know about any bullying behavior directed at McKenzie. But upon hearing about the bullying, she discussed a plan with Janice that would allow McKenzie to leave her classroom any time she felt threatened (the "safety plan"). Stewart assured Janice that she would notify all of McKenzie's teachers about the safety plan so that McKenzie could leave their classrooms too. When Janice asked if she needed to sign the plan or any other documentation, Stewart reassured her that she did not need to sign anything and Stewart would "take care of it." *Id.* at 84–85.

Before the call ended, Janice asked if she could include Jasmine (McKenzie's mother) on the phone call, and Stewart agreed. Soon after the call, Janice called Stewart back with Jasmine on the line. On this call, Janice, Jasmine, and Stewart discussed the instances of bullying and the safety plan. During the call, Jasmine said that she was going to call a state department to complain about the bullying. Stewart advised her not to. Stewart assured Janice and Jasmine that she would "handle it" and emphasized that the safety plan would address the problem by allowing McKenzie to leave the classroom whenever she felt threatened by the bullying. *Id.* at 86.

Janice never knew whether McKenzie ever used the safety plan. But she noticed that McKenzie would comment that she had a good day on the days when E.C. was assigned to in-school suspension, which meant that he was not in the classroom with

McKenzie on those days. Janice did not follow up further with Stewart because she saw nothing unusual about McKenzie's behavior following the phone call. On November 6, unbeknownst to Janice, McKenzie wrote in her diary, "Might just kill myself for me. Yep. Said it. I might do it for her, my grandma, Chloe, and me. So bye." *Id.* at 115.[5]

On December 3, about five weeks after the safety plan was put in place, McKenzie wrote in her diary at 1:30 p.m.: "Dear diary I am in math class like get me out!! I don't know how to do this stuff. help . . . [three dots were drawn] Bitch move on. Sup Bitch. . . . [T]hat fucker [student's name redacted] in a grave." Doc. 181-14 at 1. McKenzie returned home from school, hugged her grandmother, ate a snack, and started to do her homework. Janice noticed that McKenzie was quieter than usual, but she did not observe anything else out of the ordinary. Later that day, McKenzie died by suicide in her grandmother's home.

The day after McKenzie's death, one of her classmates visited Janice at home and reported that E.C. had told McKenzie to kill herself. Janice then recalled that McKenzie had said that E.C. told her to "kill [herself], just die" between August and November of that year. Doc. 189-11 at 133.

---

[5] This diary entry itself is not included in the record before us. But the record includes a copy of Janice's deposition, in which she read the diary entry. Seeing no reason why the diary entry could not be reduced to admissible form at trial, we consider it as part of the summary judgment record. *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005).

**B.    DCS's Anti-Bullying Policies**

While McKenzie was a student at U.S. Jones Elementary, DCS had an anti-bullying policy in place. The policy required that instances of bullying be reported and documented. Before the start of every school year, DCS required "annual training for all certified employees [on] suicide awareness and prevention." Doc. 189-2 at 137. The annual training could be "provided within the framework of existing in[-]service training programs." *Id.* To that end, DCS teachers and staff completed an annual "Back to Basics" training that covered the topics of bullying and suicide prevention.

DCS also had in place a "Code of Conduct." The Code of Conduct detailed different forms of misconduct and the consequences for such misconduct. It defined bullying as "[c]omitting or instigating aggressive acts toward another student with the intent to irritate, intimidate, hurt, or produce a negative reaction from the other student." Doc. 189-10 at 9. And it laid out punishment for bullying by students in kindergarten through fifth grade including contacting parents, in-school suspension, and out-of-school suspension.

**C.    The Adamses' Lawsuit**

Following McKenzie's death, Jasmine and Janice[6] sued DCS and several school officials, including Superintendent Kyle Kallhoff, U.S. Jones Elementary School Principal Tori Infinger,

---

[6] Jasmine sued in her individual capacity. Janice sued in her capacity as the personal representative of McKenzie's estate.

Stewart, and Mims. In the operative complaint, the Adamses alleged that before McKenzie's death, the State of Alabama had enacted a statute, the Jamari Terrell Williams Act, that required Alabama public schools to adopt plans or programs that addressed bullying. The Act went into effect shortly before McKenzie's death. According to the complaint, DCS failed to implement the policies the Act required. Without the required policies in place, the Adamses alleged, DCS failed to train officials and teachers on how to identify and respond to student-on-student bullying.

The operative complaint included 11 counts, with some claims arising under federal law and others under Alabama law. Count I alleged that DCS was liable under Title IX[7] because it was deliberately indifferent to sex-based harassment and discrimination that it was aware was being directed at McKenzie at school. Count II alleged that DCS was liable under Title VI[8] for the same reason. Counts III, IV, VIII, IX, X, and XI pled claims under 42 U.S.C. § 1983, alleging that DCS, Kallhoff, and Infinger violated McKenzie's right to substantive due process and equal protection under the Fourteenth Amendment. And in Counts V, VI, and VII, the Adamses alleged Alabama state-law wrongful death claims against each of the defendants. Each wrongful death claim was based on some form of negligent, reckless, or wanton conduct that allegedly led to McKenzie's death.

---

[7] Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

[8] Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

The defendants moved for summary judgment on all claims. The district court granted the motion. The district court explained to prevail on the Title IX claim against DCS, the Adamses had to show, among other things, that DCS acted with deliberate indifference. The court concluded that DCS's response to both the specific instances of bullying that McKenzie faced and the general threat of bullying did not amount to deliberate indifference.

As to the Adamses' Title VI claim against DCS and their equal protection claims against DCS, Kallhoff, and Infinger, the district court explained that the Adamses had to show that the defendants acted with an intent to discriminate. In the context of this case, they had to show that DCS maintained a policy or custom of ignoring student-on-student bullying. The court found no evidence that DCS acted with an intent to discriminate.

Turning to the Adamses' substantive due process claims, the court concluded that the Adamses failed to show a substantive due process violation because DCS had no constitutional duty to protect McKenzie. Further, the district court explained that in a non-custodial setting, conduct by a government actor must be characterized as arbitrary or conscience-shocking to arise to the level of a substantive due process violation. The court then concluded that the defendants' conduct was not arbitrary or conscience-shocking to give rise to a constitutional deprivation.

Finally, in considering the Adamses state-law tort claims, the court ruled that the claims against Kallhoff and Infinger were

barred by state-agent immunity.[9] In any event, the court concluded, under Alabama law, Kallhoff and Infinger's actions were not the proximate cause of McKenzie's injury because her death by suicide cut off any causal link and barred any tort liability.

The Adamses timely appealed.

## II.    STANDARDS OF REVIEW

We review an order granting summary judgment *de novo* and apply the same legal standards as the district court. *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012). Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P 56(a); *see Greenberg v. BellSouth Telecomms, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007). At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Only disputes about material facts will preclude the granting of summary judgment. *Id.* at 248. We are required to view the facts in the light most favorable to the non-moving party. *Hill v. Cundiff*, 797 F.3d 948, 967 (11th Cir. 2015).

---

[9] The district court also determined that all the defendants were entitled to state-agent immunity, but on appeal, the Adamses challenge the court's determination only as to Kallhoff and Infinger. Thus, we do not consider whether the other defendants were entitled to immunity. *See United States v. Campbell*, 26 F.4th 860, 874–75 (11th Cir. 2022) (en banc).

A grant of summary judgment on state-agent immunity grounds is also reviewed *de novo*. *Id.*

## III.   DISCUSSION

On appeal, the Adamses argue that the district court erred in granting summary judgment to the defendants on all claims. On their federal Title IX, Title VI, equal protection, and substantive due process claims,[10] they argue that they presented sufficient evidence to raise a genuine dispute of fact on each of the required elements of each claim. In support of their Alabama wrongful death claims, the Adamses argue that Kallhoff and Infinger were not entitled to state-agent immunity because their conduct did not involve the exercise of judgment or discretion in performing their official duties.

We begin by addressing the Adamses' federal claims. We then turn to their wrongful death claims under Alabama law.

## A.   Title IX, Title VI, and 42 U.S.C. § 1983 Equal Protection and Substantive Due Process Claims

The Adamses argue that the district court erred in granting the defendants summary judgment on their federal claims because there is at least a genuine dispute of fact on each of the required

---

[10] The Adamses brought both their equal protection and substantive due process claims under 28 U.S.C. § 1983. Because our analysis of an equal protection claim mirrors that of a Title VI claim, *see Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1405 n.11 (11th Cir. 1993), we examine the equal protection and Title VI claims together and the § 1983 substantive due process claim separately.

elements of each claim. As we will explain, the Adamses must show deliberate indifference to sustain their Title IX and Title VI claims, intentional discrimination to sustain their equal protection claims, and arbitrary or conscience-shocking conduct to sustain their substantive due process claims. Because the Adamses failed to present sufficient evidence to show that the defendants' conduct satisfied any of these standards, the district court properly granted summary judgment.

*1.    Title IX Claim*

Under Title IX, "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance." 20 U.S.C. § 1681. When a recipient of federal funds intentionally violates Title IX's prohibition on discrimination, it may be held liable for money damages. *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 74–75 (1992).

In *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, the Supreme Court recognized that Title IX creates a private right of action for "student-on-student sexual harassment." 526 U.S. 629, 639, 646–47 (1999). To hold a Title IX funding recipient[11] accountable for student-on-student sex harassment, a plaintiff must establish that the public school was "deliberately indifferent to sexual harassment, of which it has actual knowledge, that is so

---

[11] It is undisputed that DCS is an education program receiving federal financial assistance.

severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school." *Hill*, 797 F.3d at 968 (alterations adopted).[12]

We conclude that no reasonable jury could find that the defendants acted with deliberate indifference in response to the known acts of bullying against McKenzie. Thus, we can resolve this claim based solely on the failure to show deliberate indifference, without reaching the claim's other elements. A school is deliberately indifferent only where its response, or lack thereof, to student-on-student harassment or discrimination is "clearly unreasonable" in the light of known circumstances. *Davis*, 526 U.S. at 648. To act with deliberate indifference, a school district or official "must know of and disregard an excessive—that is, an extremely great—risk to the victim's health or safety." *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1330 (11th Cir. 2020).

A school district is not deliberately indifferent simply because the measures it takes to stop the harassment or discrimination ultimately are ineffective. *See Sauls v. Pierce Cnty. Sch. Dist.*,

---

[12] Said differently, a plaintiff must prove four elements to establish a Title IX violation: (1) the defendant is a federal funding recipient; (2) an appropriate person had actual knowledge of the alleged harassment or discrimination; (3) the defendant was deliberately indifferent to the alleged harassment or discrimination; and (4) the harassment or discrimination was so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit. *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294–98 (11th Cir. 2007).

399 F.3d 1279, 1285 (11th Cir. 2005); *see also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 456 n.12 (5th Cir. 1994) (en banc) (explaining that a school official may not be deliberately indifferent where it "warn[s] the state actor, notif[ies] the student's parents, or remov[es] the student from the teacher's class" even if those responses are ineffective). Rather, to rise to the level of deliberate indifference, the response to the harassment or discrimination must amount to "an official decision . . . not to remedy the violation." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *accord Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1259 (11th Cir. 2010). Deliberate indifference is an exacting standard; neither negligence nor mere unreasonableness is enough. *Davis v. Carter*, 555 F.3d 979, 983 (11th Cir. 2009).

The Adamses argue that DCS was deliberately indifferent (1) by ignoring the instances of bullying directed at McKenzie and (2) by failing to adopt anti-bullying policies as required by the Jamari Terrell Williams Act. To evaluate each argument, we take a close look at the facts in evidence.

First, we consider DCS's response to the instances of known bullying[13] directed at McKenzie. For starters, Mims knew that

---

[13] For purposes of this appeal, we assume that the harassment McKenzie endured was the type of harassment included within the broad sweep of Title IX. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) ("There is no doubt that if we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." (alteration adopted and internal quotation marks omitted)); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810

McKenzie was being bullied. After Mims heard E.C. call McKenzie "n*****," she disciplined him by writing him up and sending him to the office. After she discovered the profanity-laden note exchanged between E.C. and McKenzie, she again wrote E.C. up, and he received a day of in-school suspension. All of these punishments were in line with DCS's Code of Conduct. True, McKenzie was written up for this incident along with E.C. But there is no indication that Mims "[knew] of and disregard[ed]" an excessive risk to McKenzie's health and safety by responding the way that she did. *Hernandez*, 982 F.3d at 1330. A reasonable jury could not conclude that Mims's actions, which included writing E.C. up, sending him to the office, and assigning him a day of -in-school suspension, were unreasonable in the light of the known circumstances. Thus, we cannot say that Mims's response amounted to an "official decision . . . not to remedy the [harassment]." *Gebser*, 524 U.S. at 290. We conclude that the Adamses have raised no genuine issue of material fact that Mims was deliberately indifferent to the instances of bullying of which she was aware.

Stewart, too, knew about the bullying directed at McKenzie. Once she was informed that McKenzie was being bullied, Stewart put in place a safety plan, which allowed McKenzie to leave the classroom any time she felt threatened by the bullying. After the safety plan was implemented, Janice noticed no unusual behavior in McKenzie that would have prompted Janice to follow up with

---

(11th Cir. 2010) ("Calling a female colleague a 'bitch' is firmly rooted in gender. It is humiliating and degrading based on sex.").

Stewart. We acknowledge that there is no indication in the record that McKenzie used the safety plan or that it was effective in curbing the bullying. Perhaps a more effective response could have been implemented—but the deliberate indifference standard does not turn on effectiveness. Stewart's decision to implement the safety plan represented a reasonable attempt to rectify the bullying. Therefore, even if in hindsight something more effective could have been done, her response to the bullying does not amount to deliberate indifference.[14]

Second, we address the Adamses' argument that DCS was deliberately indifferent through its failure to implement an anti-bullying plan consistent with the Jamari Terrell Williams Act. The Act was enacted in response to the suicide of Williams, who was bullied online by students in his class. Ala. Code § 16-28B-4. The Act requires each public school to "develop plans or programs, including, but not limited to, peer mediation teams, in an effort to encourage students to report and address incidents of bullying, violence, or threats of violence." *Id.* § 16-28B-4(d). Under the Act, at the beginning of the school year, a school must provide programming to faculty and students on "the issue of bullying and school violence with faculty and students." *Id.* The programming must "include a discussion of available resources" and "encourage the reporting of incidents of bullying." *Id.* In addition, each school must "periodically convene a committee of faculty and students to

---

[14] We find the evidence insufficient to establish a genuine issue of material fact that any other defendant was aware that McKenzie was being bullied.

review and discuss the issue of bullying and make recommendations to school administrators regarding school climate, safety, and bullying." *Id.* The Act went into effect on June 1, 2018. In response to the Act, the Alabama State Department of Education disseminated a model plan to all Alabama public school systems in December 2018. DCS adopted the model plan in February 2019.

Although DCS did not formally adopt a plan compliant with the Act until about eight months after the Act went into effect, the record shows that it was normal practice for DCS to wait for and then adopt model plans disseminated by the State Department of Education. Further, even before DCS adopted the model plan, it had in place its own annual Back to Basics training that addressed the topics of bullying and suicide prevention. There is no evidence that the training was intentionally or recklessly deficient or that the decision to wait for the model plan was a reckless decision. A reasonable jury therefore could not conclude that DCS's decision to wait to adopt a model policy, especially while having an anti-bullying policy already in place, was clearly unreasonable.

What happened to McKenzie was beyond tragic. The evidence of record does not establish any action or lack of action by DCS or any of the named individual defendants that amounted to deliberate indifference, however. So the district court did not err in granting summary judgment to the defendants on the Adamses' Title IX claim.

Because we resolve the Adamses' Title IX claim on the deliberate indifference element, we do not reach the other elements.

We feel it important to note, however, that we reject the defendants' assertion that the repeated taunting of a nine-year-old girl, including sexualized and racialized comments on her skin tone, hair, and physical appearance, and name calling such as "n*****," "black bitch," "dumb black bitch," and "pussy ass bitch" amounts to "at most, only childish name-calling and teasing that is inevitable among elementary school students" or "adolescent teasing." Appellees' Br. at 4–5, 7. We have no doubt that such conduct at least raises a question of fact whether the harassment and bullying McKenzie faced was severe and pervasive.

####    2.    Title VI and Equal Protection Claims

Next, we consider the Adamses' Title VI and equal protection claims. Under Title VI, "[n]o person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance." 42 U.S.C. § 2000d. The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. We have recognized that Title VI provides no more protection than the Equal Protection Clause does. *Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1405 n.11 (11th Cir. 1993).

To establish that a defendant is liable under Title VI or the Equal Protection Clause, a plaintiff must prove discriminatory intent. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1202 (11th Cir.

1999); *Elston*, 997 F.2d at 1406. Discriminatory intent may be established by evidence of a "history of discriminatory official actions." *Elston*, 997 F.2d at 1406. To hold a supervisory official or government entity liable, a plaintiff must show that the violation resulted from a custom or policy put in place by the supervisor or the entity. *See Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442–43 (11th Cir. 1985). The discriminatory practice must be so widespread as to put the supervisor or entity on notice of the need to act. *Id.* at 1443.

Specific to their Title VI claim, the Adamses argue that DCS was deliberately indifferent to the race-based harassment that McKenzie faced. Their argument assumes that Title VI creates a private cause of action for student-on-student race-based harassment and that a school district can be held liable if it was deliberately indifferent to the harassment. Whether deliberate indifference is the standard applicable to a Title VI claim is a question of first impression in our circuit. Other circuits have held that the deliberate indifference standard applicable to Title IX claims also applies to Title VI claims. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664–71 (2d Cir. 2012) (applying deliberate indifference standard to Title VI claim); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 271–73 (3d Cir. 2014) (holding that the Title IX deliberate indifference standard is applicable to Title VI claims); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015) (same); *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty.*, 334 F.3d 928, 934 (10th Cir. 2003) (same).

Today we join these circuits in holding that to prevail on a Title VI claim for student-on-student race-based harassment, a plaintiff must prove that the defendants were deliberately indifferent to the harassment. Because Congress modeled Title IX after Title VI, our conclusion is straightforward. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009). The two statutes are parallel, except that Title IX prohibits race-based discrimination whereas Title VI prohibits sex-based discrimination. *Gebser*, 524 U.S. at 286. The statutes operate in the same manner—"conditioning an offer of federal funds on a promise by the recipient not to discriminate." *Id.* As a result, just like a school district engages in intentional discrimination and is liable under Title IX when it is "deliberately indifferent to known acts of student-on-student sexual harassment," *Davis*, 526 U.S. at 646–47, a school district engages in intentional discrimination and is liable under Title VI when it is deliberately indifferent to known acts of student-on-student racial harassment.

This conclusion is consistent with Supreme Court decisions that interpret "Title IX consistently with Title VI." *Barnes v. Gorman*, 536 U.S. 181, 185 (2002); *see Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022). We therefore agree with the Tenth Circuit that "the [Supreme] Court's analysis of what constitutes intentional sexual discrimination under Title IX directly informs our analysis of what constitutes intentional racial discrimination under Title VI." *Bryant*, 334 F.3d at 934.

Notwithstanding the existence of a cause of action, the district court properly granted summary judgment to the defendants

on the Adamses' Title VI claim. As we explained when applying the same standard to their Title IX claim, they failed to submit evidence that DCS acted with deliberate indifference to any known instances of bullying directed at McKenzie.

In support of their equal protection claim, the Adamses argue that DCS, Kallhoff, and Infinger "created a pervasive policy, custom, and practice of ignoring discriminatory harassment" through their failure to implement policies required by the Williams Act and by failing to follow DCS's own Code of Conduct. Appellants' Br. at 16. This claim, too, fails because the record does not support that the defendants acted even with deliberate indifference. It follows, then, that no reasonable jury could conclude the defendants' actions amounted to intentional discrimination—which, in this context, would mean a pervasive practice or custom of ignoring the bullying directed at McKenzie. Nor is there any indication in the record that bullying or harassment was a widespread problem at DCS or U.S. Jones Elementary School so as to put the defendants on notice of the need to take action to prevent or stop it. Thus, we cannot conclude that DCS, Kallhoff, and Infinger acted or failed to act with an intent to discriminate.

3.     *Substantive Due Process Claims*

Lastly, we review the Adamses' substantive due process claims under § 1983. Section 1983 provides a remedy against any person who, acting under color of state law, deprives another of rights protected by the Constitution. 42 U.S.C. § 1983. The Adamses contend that the defendants deprived McKenzie of rights

protected by the Due Process Clause of the Fourteenth Amendment, which provides that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. The substantive component of the Due Process Clause protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them. *Carter*, 555 F.3d at 981–82. In non-custodial settings, such as in public schools, conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience-shocking in a constitutional sense. *Hernandez*, 982 F.3d at 1330.

To rise to the "conscience-shocking level, conduct most likely must be intended to injure in some way unjustifiable by any government interest." *Carter*, 555 F.3d at 982 (internal quotation marks omitted and alterations adopted). In considering whether conduct raises to the level of arbitrary or conscience-shocking, deliberate indifference, without more, is rarely a basis for substantive due process liability in cases arising in the school context. *Hill*, 797 F.3d at 980; *see also Hernandez*, 982 F.3d at 1330 (expressing doubt that deliberate indifference can ever be arbitrary or conscience shocking in a non-custodial setting).

The Adamses argue that DCS, Kallhoff, and Infinger's "choice of indifference in regards to the Jamari Terrell Williams Act was founded on preference rather than reason or thought and was therefore, arbitrary by definition." Appellants' Br. at 19. Even if we assume that deliberate indifference can rise to the level of arbitrary

or conscience-shocking conduct—an issue we do not decide to-day—the evidence simply does not support a finding that the de-fendants were deliberately indifferent. Summary judgment there-fore was due to be granted on the Adamses' substantive due pro-cess claims.[15]

To sum up, we conclude that a reasonable jury could not find that DCS acted with deliberate indifference, that it intention-ally discriminated against McKenzie, or that DCS, Kallhoff, or In-finger's actions were arbitrary or conscience-shocking. In turn, the district court did not err in granting summary judgment to the de-fendants on the Adamses' Title IX, Title VI, equal protection, and substantive due process claims.

## B.   Alabama Wrongful Death Tort Claims

The Adamses also challenge the district court's grant of sum-mary judgment on their Alabama wrongful death claims. They ar-gue that the district court erred in concluding that Kallhoff and In-finger are entitled to immunity under Alabama state law. Immun-ity does not apply, according to the Adamses, because their claims do not arise out of conduct which "involv[ed] the exercise of judg-ment and discretion [by Kallhoff and Infinger] in performing their official duties." Appellants' Br. at 25. Instead, the Adamses con-tinue, Kallhoff and Infinger "did not implement the rules required by the Act"; thus, they were not "engag[ing] in discretion in the

---

[15] Because the defendants' conduct was not arbitrary or conscience-shocking, and thus did not amount to a constitutional violation, we need not address whether the defendants were entitled to qualified immunity.

application of such rules" and were acting beyond their scope of authority. *Id.* We reject their argument.

Alabama law affords immunity from suit to state officials. The state's Constitution provides that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. art. I, § 14. The Alabama Supreme Court has extended this sovereign immunity to a person acting as an agent of a municipal board of education when the person is performing discretionary duties or duties that require the exercise of judgment. *Carroll ex rel. Slaught v. Hammett*, 744 So. 2d 906, 910 (Ala. 1999) ("[A] person who acts as an agent of a county board of education shares in the State's sovereign immunity if the act complained of was committed while that person was performing a discretionary act.").

The Alabama Supreme Court thus has recognized that a state agent is immune from civil liability when she "formulat[es] plans [and] policies" and "exercis[es] judgment in . . . educating students." *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000); *Ex parte Nall*, 879 So. 2d 541, 544 (Ala. 2003) ("Generally, State agents are afforded immunity from civil liability when the conduct made the basis of the claim is based on the exercise of judgment in supervising and educating students."). The Court has held that a school administrator was entitled to state-agent immunity where she "negligently failed to exercise proper safety measures, to monitor school equipment, to maintain safety precautions, and to institute safety measures," *Louviere v. Mobile Cnty. Bd. of Educ.*, 670 So. 2d 873, 877 (Ala. 1995), noting that school administrators are entitled to

immunity when "formulating policies," *Ex parte Trottman*, 965 So. 2d 780, 786 (Ala. 2007).

Here, the Adamses argue that Kallhoff and Infinger are not entitled to immunity because the Williams Act mandated that Alabama public schools implement plans addressing bullying. As a result, the Adamses contend, Kallhoff and Infinger did not have any discretion whether to implement such a plan. According to the Adamses, the "Alabama State Legislature removed any professional discretion by mandating the schools [to] take action." Appellants' Br. at 25.

We agree with the district court that Kallhoff and Infinger are entitled to immunity because the Adamses seek to hold them liable for conduct that involved the performance of official duties to supervise and educate students. As the superintendent of DCS, Kallhoff addressed anti-bullying and suicide prevention with teachers and staff as part of the school's annual Back to Basics training. Once the Williams Act went into effect, DCS and Kallhoff decided to wait until the State Department of Education disseminated a model plan to the school systems. In the interim, however, DCS relied on its current anti-bullying training. And Infinger, as Kallhoff's subordinate, acted under his direction to carry out the existing anti-bullying plan, which was within the performance of her official duties as principal. Central to the Adamses' claim is that Kallhoff and Infinger are liable because they decided to rely on their own anti-bullying training while waiting for the State Department of Education to promulgate its model plan. But state-agent

immunity applies to claims arising out of this type of conduct. *See Ex parte Cranman*, 792 So. 2d at 405. And so we agree with the district court that Kallhoff and Infinger were entitled to state-agent immunity from the Adamses' wrongful death claims.

The Adamses nevertheless argue that Kallhoff and Infinger should not be entitled to state-agent immunity because an exception applies. Alabama law recognizes several exceptions to state-agent immunity. As relevant here, state-agent immunity does not apply when a school official acts beyond her authority. *Id*. A state agent acts beyond her authority when she "fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Ex parte Est. of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006) (alteration adopted and internal quotation marks omitted).

The Adamses argue that by using their discretion to classify instances of bullying, Kallhoff and Infinger acted beyond their authority. To support their argument, the Adamses point to the DCS Code of Conduct, which sets forth a checklist definition for identifying and disciplining bullying, and argue that the checklist does not allow for discretion in a school official's identification of, and discipline for, bullying. According to the Adamses, when Kallhoff and Infinger failed to classify E.C.'s aggressive acts toward McKenzie as bullying and failed to discipline him in line with the Code of Conduct, they acted beyond their authority. But the record contains no indication that either Kallhoff or Infinger had any direct interactions with McKenzie or were a part of the disciplinary process for E.C. In absence of such evidence, we cannot conclude that

either Kallhoff or Infinger acted beyond their authority. Accordingly, no exception to state-agent immunity applies to Kallhoff's or Infinger's conduct.[16]

## IV.    CONCLUSION

Despite our deepest sympathy for the tragic loss of McKenzie Adams, for the reasons we have explained, the district court did not err in granting summary judgment on the Adamses' federal and state claims. We affirm the judgment of the district court.

**AFFIRMED.**

---

[16] The district court also concluded that Kallhoff and Infinger were entitled to summary judgment on the state-law tort claims because McKenzie's suicide was an intervening cause that made their actions not a proximate cause of any injury. Because we affirm based on state-agent immunity, we do not address the district court's alternative conclusion about proximate causation.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

### ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 01, 2023

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  22-11317-AA
Case Style:  Jasmine Adams, et al v. Demopolis City Schools, et al
District Court Docket No:  2:20-cv-00027-TFM-N

All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website.

Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, <u>costs taxed against the appellants</u>.

Please use the most recent version of the Bill of Costs form available on the court's website at
<u>www.ca11.uscourts.gov.</u>

<u>Clerk's Office Phone Numbers</u>
General Information:     404-335-6100      Attorney Admissions:         404-335-6122
Case Administration:    404-335-6135      Capital Cases:               404-335-6200
CM/ECF Help Desk:     404-335-6125      Cases Set for Oral Argument: 404-335-6141

OPIN-1A Issuance of Opinion With Costs